STATE OF CONNECTICUT *v.* JOSE CARTY
(AC 26705)

Bishop, Rogers and Lavine, Js.

to testify as a witness based on the defendant's former connections to this [s]tate."

Argued November 29, 2006—officially released March 13, 2007

*Joseph Visone*, special public defender, for the appellant (defendant).

*Melissa Streeto Brechlin*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Steven G. Weiss*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, J. The defendant, Jose Carty, appeals from the judgments of conviction, rendered after a jury trial, of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3)[1] and of one count

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery . . . he . . . (3) uses or threatens to use a dangerous instrument . . . ."

of possession of a weapon in a motor vehicle in violation of General Statutes § 29-38.[2] On appeal, the defendant claims that the trial court improperly (1) joined the two counts of robbery in the first degree, (2) allowed the introduction of a credit card receipt into evidence, (3) permitted the prosecution to cross-examine him about the details of his prior criminal history and (4) instructed the jury in a manner that deprived him of his constitutional rights. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts regarding the robbery of the first victim, Flora Gamble. During the early morning hours of March 27, 2001, at approximately 2 a.m., Gamble left her house in Stamford with the intention of buying drugs and cigarettes. As she walked along the sidewalk, the defendant drove his car next to Gamble and called out to her by her name. The defendant asked Gamble if she knew where he could purchase illegal drugs. Gamble indicated that she did know where he could buy drugs and that she, too, was looking for drugs to buy. She then offered the defendant $10 for a ride to a location where she indicated that they both could buy drugs.

After Gamble got in the car with the defendant, he drove into the parking lot of a car wash, stopped the

---

[2] General Statutes § 29-38 (a) provides in relevant part: "Any person who knowingly has, in any vehicle owned, operated or occupied by such person, any weapon . . . for which a proper permit has not been issued as provided in section 29-28 . . . shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon . . . in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon', as used in this section, means any BB. gun, any blackjack, any metal or brass knuckles, any police baton or nightstick, any dirk knife or switch knife, any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, any stiletto, any knife the edged portion of the blade of which is four inches or over in length, any martial arts weapon or electronic defense weapon, as defined in section 53a-3, or any other dangerous or deadly weapon or instrument."

vehicle and pulled out a silver handled knife. The defendant demanded that Gamble, who was holding $60 in her hand, give him all of her money and held the knife to her neck. Gamble gave him the money and was then let out of the car. She then telephoned the police to report the incident.

The jury reasonably could have found the following facts regarding the robbery of the second victim, Judy Taylor. During the early morning hours of April 1, 2001, at approximately 3 a.m., Taylor walked with a friend to an Exxon gasoline station on Washington Boulevard in Stamford to buy cigarettes. Taylor and her friend saw the defendant in his car at the gasoline station and asked him for a ride home. The defendant initially refused to give them a ride home but later agreed to do so after Taylor offered to pay him $5. After Taylor and her friend got in the car, the defendant dropped Taylor's friend off first, near the intersection of Manhattan and Atlantic Streets. The defendant, with Taylor still in the car, continued to drive along Manhattan Street and into the parking lot of an old bank. The defendant drove the car around the back, near where the teller window used to be, and suddenly stopped. The defendant then jumped over the middle of the seat and put a knife against Taylor's throat. The defendant said, "I've killed before, and it wouldn't be the first time and you wouldn't be the last." Taylor gave the defendant all of her money, which was approximately $85. The defendant then told Taylor to get out of the car, which she did. The defendant drove away from the scene.

When the defendant had left, Taylor ran out to the street and flagged down a police car that happened to be passing by. After reporting the incident, Taylor was given a ride home. Later that night, Taylor identified the defendant, whom she had viewed in person as he was being held by the police. Subsequently, Gamble also

identified the defendant from a photographic lineup. Additional facts will be set forth as necessary.

On February 13, 2002, the state filed a motion to consolidate the trials of the defendant, who had been charged with two counts of robbery in the first degree in violation of § 53a-134 (a) (3) and one count of possession of a weapon in a motor vehicle in violation of § 29-38.[3] The court heard oral arguments on the motion and granted the motion to consolidate. Following trial, the jury returned a guilty verdict on all three counts, and the defendant was sentenced to an effective term of ten years imprisonment.[4] The defendant now appeals.

I

On appeal, the defendant's first claim is that the court improperly granted the state's motion to consolidate the robbery charges. This claim has no merit. The defendant argues that under *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), he should have received separate trials because the two robberies did not involve discrete, easily distinguishable factual scenarios. The state, on the other hand, claims that the defendant was not prejudiced by the joinder because the factual bases of both robberies would have been cross admissible, as acts of misconduct used to prove identity, if he had been tried separately on each count. Moreover, the state claims that even if the evidence of the two separate incidents was not cross admissible, the court did not abuse its discretion in granting the motion to consolidate because the underlying facts of each crime easily could be distinguished by the jury. We agree with the state that the evidence of the two robberies would

---

[3] At the hearing on the motion for consolidation, the defendant also had a motion for severance pending.

[4] On each robbery count, the defendant was sentenced to serve five years imprisonment, to run consecutively. He was sentenced to one year imprisonment, to serve concurrently, for the conviction of possession of a weapon in a motor vehicle.

have been cross admissible and that the defendant, therefore, was not prejudiced by the joinder.[5]

We first set forth the standard of review for a court's grant of a motion for joinder in a criminal trial. "It is indisputable that the decision to join or sever offenses is submitted to the discretion of the trial court and may not be disturbed absent a manifest abuse of that discretion." *State* v. *Perry*, 14 Conn. App. 526, 531, 541 A.2d 1245, cert. denied, 208 Conn. 814, 546 A.2d 281 (1988).

Our General Statutes provide the basis for the trial court to join or sever criminal charges: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." General Statutes § 54-57; see also Practice Book § 41-19. In order for a defendant to prevail on a challenge to the court's joinder of multiple charges, "the defendant must demonstrate that the denial of severance resulted in substantial injustice, and also that any resulting prejudice was beyond the curative power of the court's instructions." (Internal quotation marks omitted.) *State* v. *Perry*, supra, 14 Conn. App. 531. Our Supreme Court has determined that "[w]here evidence of one incident *can* be admitted at the trial of the other, separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Emphasis in

---

[5] We note that at trial, the state presented arguments for joinder both under the factors enunciated in *State* v. *Boscarino*, supra, 204 Conn. 722–24, and under the theory that the evidence from each case would be cross admissible. Although the court granted the state's motion to consolidate the charges without explaining which theory it relied on, we conclude that the court could have properly joined the charges under either theory.

original.) *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987).

We agree with the state that the defendant was not substantially prejudiced by the joinder of the two charges because the evidence from each case would have been cross admissible in two separate trials. "As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. . . . The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. . . . Such evidence is admissible for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161–62, 665 A.2d 63 (1995).

"The analysis on the issue of other crimes evidence is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crimes evidence. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones*, 205 Conn. 638, 660, 534 A.2d 1199 (1987).

Our law on the use of evidence of other crimes to prove the defendant's identity is well settled. "Case

law has established that, on the issue of identity, the probative value of evidence of other crimes or misconduct of an accused outweighs its prejudicial impact where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . Much more is required than the mere repeated commission of crimes of the same class. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." (Citations omitted; internal quotation marks omitted.) *State* v. *Pollitt*, supra, 205 Conn. 69–70.

We agree with the state's argument that the characteristics of the two robberies were unique enough to have been considered a signature offense. The two robberies occurred within four days of each other, and each involved female victims in their late forties who were walking during the early morning hours in the same area of Stamford. The victims both approached and offered to pay the defendant for a ride home in his car. Significantly, both victims positively identified the defendant's vehicle by its exterior appearance, as well as the contents of the interior, such as the child safety seat.[6] See id., 72 (unique attributes of defendant's truck, such as color and tire defect, used as factor in admitting prior misconduct as " 'signature offenses' "). Finally, the victims were robbed in the same manner: the defendant, who was alone with the victims, drove them to two secluded, dark parking lots, where he held a knife to the victims' throats and demanded their money.

---

[6] Gamble was able to identify the defendant's car because it was dented on the right side near the wheel and because the backseat of the car had a baby seat and other "junk" in it.

Taylor gave a substantially similar description of the car as a "burgundy car, this old, beat up burgundy car. It was beige inside. One of the front headlights was like bashed. . . . It had [a] baby seat in the back in the middle [and a] whole bunch of junk was all in the car."

These similarities between the two robberies would have made the circumstances of each crime cross admissible in the trial of the other. The defendant, therefore, was not substantially prejudiced by the joinder of these two charges, and the court's grant of the state's motion to consolidate was proper.[7]

---

[7] Even if the evidence from each robbery would not have been cross admissible in the trial of the other, we would still conclude that the joinder was proper under *Boscarino*. On appeal, the defendant has challenged the joinder only under the first prong of the *Boscarino* analysis, namely, that the two robberies did not involve discrete, easily distinguishable factual scenarios. See *State* v. *Ellis*, 270 Conn. 337, 374–75, 852 A.2d 676 (2004), citing *State* v. *Boscarino*, supra, 204 Conn. 722–24.

When we exercise appellate review over the court's joinder and conclude that joinder could be affirmed because it satisfied either the requirements of cross admissibility or the *Boscarino* standards, we have affirmed challenges to joinder on either ground. See *State* v. *Pollitt*, supra, 205 Conn. 72 (affirming joinder only on theory of cross admissibility); *State* v. *Santaniello*, 96 Conn. App. 646, 653, 902 A.2d 1 (affirming joinder only under *Boscarino* even though evidence from each crime "likely would have been admissible in separate trials to prove motive and consciousness of guilt"), cert. denied, 280 Conn. 920, 908 A.2d 545 (2006).

We have also affirmed challenges to joinder on a combination of both grounds. See *State* v. *David P.*, 70 Conn. App. 462, 468–70, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002); *State* v. *Marsala*, 43 Conn. App. 527, 533–37, 684 A.2d 1199 (1996), cert. denied, 239 Conn. 957, 688 A.2d 329 (1997). We note that although the method by which the crimes are committed must be sufficiently similar to constitute evidence of a "signature offense," the jury may be able to distinguish easily between the different factual scenarios, as required by *Boscarino*, where the crimes occurred on different dates and the victims can testify about the circumstances of the crimes individually. See *State* v. *Marsala*, supra, 534.

We conclude that the joinder by the court can be affirmed both because the evidence was cross admissible and because, under *Boscarino*, the factual scenarios could be distinguished easily by the jury. Although the methods used by the defendant in this case were sufficiently unique to be used to prove his identity as the perpetrator of a "signature offense," the factual scenarios under which the robberies occurred were discreet enough for the jury to be able to distinguish between the two crimes. For example, even though the defendant used the same method of bringing the victims to a dark, isolated parking lot in order to rob them, the factual scenarios differed greatly in that Taylor was robbed in the parking lot of an old bank after the defendant had just dropped off Taylor's friend, whereas Gamble was robbed in the parking lot of a car wash and had been alone when she originally met the defendant. Additionally, the defendant may have used the

## II

The defendant's second claim is that the court improperly admitted evidence that he had been using a credit card that was not his own on the night of the Taylor robbery. The evidence of the credit card's use, according to the defendant, should have been excluded either because it was evidence of uncharged misconduct or because it was inadmissible hearsay.[8] Despite the defendant's assertion to the contrary, we conclude that the evidence introduced about the defendant's use of the credit card did not constitute the introduction of uncharged misconduct. We further conclude that the credit card receipt was relevant to the defendant's presence at the gasoline station on the night of the Taylor robbery and that its probative value outweighed any possible prejudicial effect.

victims' need of a ride in both crimes as the opportunity to rob them, but the locations where the victims approached the defendant, the gasoline station in Taylor's case and the side of the street in the case of Gamble, could be distinguished easily by the jury.

Finally, even if the defendant had established that he was substantially prejudiced by the joinder, he did not demonstrate that the court's jury instructions failed to cure any prejudice that might have occurred. See *State* v. *King*, 35 Conn. App. 781, 790–93, 647 A.2d 25 (1994), aff'd, 235 Conn. 402, 665 A.2d 897 (1995). We conclude that the court's instructions to the jury to consider the two charges "separately and distinctly" and its instructions outlining the elements of first degree robbery in both separate counts would have alleviated any potential prejudice that the defendant might have suffered.

[8] Although the defendant claims further that the credit card receipt, which bore the name of Rhea Ahuja, should not have been admitted because it was hearsay, the defendant failed to raise such a claim at trial. When asked if there was any basis other than the one raised in his motion in limine, which sought to keep out evidence of uncharged misconduct, defense counsel answered that there was not any other basis.

"Appellate review of evidentiary rulings is ordinarily limited to the specific legal issue raised by the objection of trial counsel. . . . In other words, [o]nce an objection has been made and the grounds stated, a party is normally limited on appeal to raising the same objection on the same basis as stated at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Trotter*, 69 Conn. App. 1, 10–11, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002). Accordingly, we decline to review the defendant's hearsay claim.

The following additional facts are necessary for our review. On April 1, 2001, the defendant made a purchase with a credit card at the gasoline station where he met Taylor. The defendant went to the front of the booth at the station and asked the attendant for cigarettes and a lighter. The defendant paid for his purchases with a credit card and signed it himself. Although the court did not permit any testimony as to whom the card actually belonged, it did permit the introduction of the receipt as a full exhibit. This receipt included the printed name of the owner of the card, Rhea Ahuja, as well as the defendant's signature.

In a pretrial motion in limine, the defendant sought to exclude any evidence of other uncharged crimes, bad acts or wrongs that he might have committed. The court did not rule on this motion before trial but rather left the issue open until evidence of such uncharged crimes was offered.

During the testimony of the gasoline station attendant, the state attempted to introduce evidence that the defendant had used a stolen credit card on the night of the Taylor incident, and the defendant objected. In the absence of the jury, the state argued that its primary reason for introducing evidence of the credit card was to prove the identity of the defendant by placing him at the Exxon gasoline station at 3:08 a.m. on April 1, 2001. The state sought to prove the defendant's presence at the gasoline station through the testimony of the attendant and through a credit card receipt, signed by the defendant at 3:08 a.m. The defendant objected, relying on his motion in limine, which had sought to prohibit the introduction of evidence of the stolen credit card as uncharged misconduct.

The court then made the following ruling: "I'm going to allow you to introduce the evidence . . . if this witness can testify to it, the evidence that [the defendant]

presented a credit card, and that's the credit card. As far as the theft is concerned, I don't see how you can tie him up to the theft." After further discussion, the court clarified its ruling by stating, "I'm not going to allow any evidence concerning the theft of the credit card. The use of the credit card not in the defendant's name, yes, you can utilize. That's perfectly proper."

After the court's ruling, the state elicited testimony from the gasoline station attendant regarding the time that the defendant had made purchases with the credit card[9] but did not attempt to introduce the receipt. The state refreshed the memory of the attendant by handing him the credit card receipt, which indicated that the purchase was made at 3:08 a.m. The state proceeded to ask several questions of the attendant in which it alluded to the fact that the card had been stolen. The court, however, sustained the defendant's objections, effectively prohibiting the state's witnesses from directly testifying as to their personal knowledge of whether the credit card had been stolen.[10]

[9] On the basis of the attendant's testimony, the defendant had used a credit card to make two separate purchases at the gasoline station that evening. At approximately 11 p.m., the defendant had used a credit card at the pump to pay for gasoline and then used a credit card to purchase cigarettes and a lighter. It was during the defendant's 11 p.m. visit to the station that the defendant made an indication toward a woman in his car, saying that it was his wife's credit card. No receipts for this visit were offered as evidence, and the defendant made no objections to the state's line of questioning related to the 11 p.m. purchases.

The state also elicited testimony from the attendant regarding the defendant's visit to the gasoline station around 3 a.m. It is the state's line of questioning regarding the defendant's use of the credit card at this time that forms the basis for the defendant's challenge on appeal.

[10] The court sustained objections to the following two questions by the state: "Did you know at that time who that credit card belonged to?" "Do you know whose name appears on that credit card?" Additionally, the state withdrew the following question after an objection from the defendant: "Why did you allow the credit transaction?"

The only question relating to the ownership of the card that the court permitted was when the state asked the attendant, "[D]id the defendant tell you whose credit card that was?" The court permitted this question, over the objection of the defendant, because it deemed the gasoline station

Although the court did not permit any testimony as to whom the card actually belonged, it did permit the introduction of the receipt as a full exhibit. This receipt included the printed name of the owner of the card, Rhea Ahuja, but with the defendant's signed name.

The defendant argues that the receipt itself was evidence of uncharged misconduct. Our review of the record, however, does not support such a conclusion. The court was careful to preclude any evidence that could lead to an inference that the credit card was, in fact, stolen. We conclude, therefore, that the admission of the receipt into evidence did not constitute the admission of uncharged misconduct.

The defendant argues that even if the time and location on the receipt made it relevant, the introduction of the receipt was unduly prejudicial. We disagree.

Our standard of review for evidentiary rulings is well established. "[T]he trial court has broad discretion in ruling on the admissibility of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *Claveloux* v. *Downtown Racquet Club Associates*, 246 Conn. 626, 628, 717 A.2d 1205 (1998).

Although relevant evidence is generally admissible, it may be excluded if such evidence is unfairly prejudicial. See Conn. Code Evid. § 4-3. "[E]vidence may be excluded by the trial court if the court determines that

attendant's conversation with the defendant relevant. Ultimately, the attendant's answer to the question was, "No, he didn't," an answer that did not even address the issue of who owned the credit card.

The defendant also objected, on the ground of relevance, to questions about why the police officer who was questioned for the purpose of laying the foundation for the introduction of the receipt had gone to Ahuja's house the day after the Taylor incident. These objections were sustained.

the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 66, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004).

We conclude that the court did not abuse its discretion by admitting evidence that the defendant used another person's credit card. This evidence was significant because it corroborated the testimony of the gasoline station attendant and was probative because the defendant's own signature on the credit card receipt independently placed him at the gasoline station at the same time as Taylor.

Moreover, the court carefully balanced the probative value of admitting the use of the credit card receipt against the prejudicial impact it would have on the defendant if the jury found out that the card was stolen. To this end, the court repeatedly prohibited the state from inquiring as to why the defendant was using a credit card with someone else's name on it. The court also prohibited the line of questioning that would have established that the card was stolen.

We cannot say that the prejudicial effect of the evidence was overwhelming. In fact, the court went to great lengths to exclude evidence that the card was stolen while still admitting evidence that the defendant used the card that placed him at the gasoline station on the night in question. Recognizing the broad discretion granted to the trial court in balancing the probative value of the evidence and its prejudicial effect on the

defendant; see *Claveloux* v. *Downtown Racquet Club Associates*, supra, 246 Conn. 628; we conclude that the court did not abuse its discretion.

## III

The defendant's third claim is that the court improperly allowed the state to introduce, through the cross-examination of the defendant, the fact that the defendant had fled the jurisdiction of Virginia after he had been arrested there for the crime of assault with the intent to maim, disfigure or kill a person. Although the defendant, on direct examination, already had admitted to pleading guilty to an unnamed felony in Virginia, he argues that the introduction of the name of the crime, "assault," was unfairly prejudicial given the violent nature of the two robberies for which he was being tried. We disagree.

The following additional facts are necessary to the resolution of this issue. Prior to trial, the defendant filed a motion to prohibit the state from impeaching him through the use of prior convictions. The defendant's motion sought to limit the scope of the state's cross-examination because such evidence, according to the defendant, would be improperly used to show that the defendant had a propensity to commit violent crimes. Before the start of the state's case, the court ruled that the state could attempt to introduce such evidence but would leave the question of its admissibility open until the state offered evidence of the defendant's criminal history.[11]

---

[11] Before the court decided that it would address the introduction of the defendant's prior criminal record when the prosecution sought to introduce it, the following colloquy occurred:

"[Defense Counsel]: It's my understanding that if the defendant does take the [witness] stand, the state will cross-examine [the defendant] on his record that stems from New York and also from a failure to appear conviction that stems here from Stamford.

"[The Prosecutor]: Well, unless he opens the door to other stuff. . . . The state reserves the right if [the defendant] does testify and opens the door on other matters that we have knowledge of, we reserve the right to introduce that evidence."

At the beginning of the defendant's case, the defendant took the witness stand. Upon direct examination, the defendant testified that he had been arrested before and that the "[f]irst time was [in 1992] in Rhode Island. Second time in Virginia in [1994]. The third time was in New York twice in [1996]." When asked what happened in those cases, the defendant answered: "I plead[ed] guilty because I was guilty of the cases."

On cross-examination, the state inquired further into the defendant's criminal history in Virginia. Specifically, the state questioned the defendant about the veracity of his prior statement that he had pleaded guilty to charges in Virginia, when, in fact, he had fled the jurisdiction. It was during cross-examination that the state asked the defendant, "[d]id you recall . . . in the state of Virginia that you fled that jurisdiction after being arrested for the crime of assault with intent to maim, disfigure or kill?" Although the defendant objected to this line of questioning, the court overruled the objections because the state was contesting the veracity of the defendant's testimony regarding his convictions.

We begin by setting forth our well settled standard of review for challenges to a court's evidentiary ruling. "Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . It is well established that the trial court has discretion on the admissibility of prior convictions. In such instances, the test is whether the prejudicial effect of the evidence did not outweigh its probative value." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, 29 Conn. App. 584, 588, 617 A.2d 174 (1992), appeal dismissed, 228 Conn. 59, 634 A.2d 293 (1993).

"Where . . . a party opens the door to a subject that goes directly to the credibility of the witness, he does so at his risk. In such cases, the rule is that a party who delves into a particular subject during the examina-

tion of a witness cannot object if the opposing party later questions the witness on the same subject. . . . That is the case [e]ven though the rebuttal evidence would ordinarily be inadmissible on other grounds . . . . The reason for such a rule is that it prevent[s] a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Citations omitted; internal quotation marks omitted.) Id.

We conclude that the court properly allowed the state to cross-examine the defendant about the veracity of his testimony that he had pleaded guilty to assault in Virginia. The defendant's admission of his conviction in Virginia opened the door to the possibility of the state questioning him about the details of the crime. In light of our code of evidence, which permits the introduction of the name of the crime when evidence of such conviction is being introduced only to impeach a witness; see Conn. Code Evid. § 6-7; we see no reason why the name of the crime should have been excluded when the state, as in this case, was utilizing the name of the crime to test the defendant's veracity.

IV

The defendant's final claim is that the court gave improper jury instructions when it told the jury that it could give "such weight as [the jury] deem[ed] advisable" to the prosecution's and defense's closing arguments.[12] Not having preserved this claim at trial, the defendant seeks review under *State* v. *Golding*, 213

[12] The court gave the following jury instruction regarding the use of the attorney's arguments, which the defendant challenges: "It's only on the basis of the evidence and nothing else that you are to make a final determination of the facts. Testimony of witnesses which was stricken from the record or exhibits which were merely marked for identification and not submitted as full exhibits are to be ignored and disregarded by you.

"In addition, all comments or remarks made by counsel or between the court and counsel must be disregarded by you. In other words, you must

Conn. 233, 239–40, 567 A.2d 823 (1989), claiming a constitutional violation of his right to have an impartial jury. The defendant argues that the court's instructions improperly led the jury to consider the attorneys' arguments as evidence and impaired the jury's ability to return its verdict only on the basis of the evidence before it. We decline to review the claim.

At the outset, we note that "[i]t is well established that [t]his court is not bound to review claims of error in jury instructions if the party raising the claim neither submitted a written request to charge nor excepted to the charge given by the trial court." (Internal quotation marks omitted.) *State* v. *Romero*, 269 Conn. 481, 487, 849 A.2d 760 (2004). Nonetheless, we consider the defendant's unpreserved claim of a constitutional violation under our standard set forth in *State* v. *Golding*, supra, 213 Conn. 239–40. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id.

decide the case solely on the evidence, the testimony and the exhibits. Now, both of the attorneys, of course, have made arguments to you during your summation. You are not bound to accept the arguments of counsel, but if you find that the argument advanced by either of them was reasonable and logical, and was based on the evidence as you recall it and was consistent with that evidence, then you're free to accept that argument as your own and give it such weight as you deem advisable under the circumstances.

"On the other hand, if you find that any argument or conclusion advanced by counsel was not based on the evidence or that it was unreasonable or illogical or inconsistent with the evidence, you're free to disregard that argument entirely."

We decline to review the defendant's claim under *Golding* because it is not of constitutional magnitude. The defendant has characterized his claim as involving his constitutional right "to have his fate determined solely on the evidence presented at trial." This claim, however, merely couches an evidentiary claim in constitutional terms. When reviewing a jury instruction, we are mindful that "[r]obing garden variety claims of improper jury instructions concerning evidentiary matters in the majestic garb of constitutional claims does not make such claims constitutional in nature." *State* v. *Ulen*, 31 Conn. App. 20, 37, 623 A.2d 70, cert. denied, 226 Conn. 905, 625 A.2d 1378 (1993).

Although our Supreme Court clearly has recognized that some errors in jury instructions are of constitutional magnitude, it has limited *Golding* review to instructional errors that so adversely prejudice the defendant that he is effectively deprived of his right to trial by jury. See, e.g., *State* v. *Walton*, 227 Conn. 32, 64–65, 630 A.2d 990 (1993) (erroneous jury instructions regarding elements of crime or burden of proof of constitutional magnitude); see also *State* v. *Hicks*, 97 Conn. App. 266, 270, 903 A.2d 685 (erroneous jury instructions regarding drawing of no adverse inference from defendant's not testifying of constitutional magnitude), cert. denied, 280 Conn. 930, 909 A.2d 958 (2006). Conversely, our Supreme Court has consistently held that the misstatement of evidentiary standards in a jury instruction is not constitutional in magnitude. See, e.g., *State* v. *Walton*, supra, 65 ("claimed instructional errors regarding general principles of credibility of witnesses are not constitutional in nature"); *State* v. *Luster*, 279 Conn. 414, 421–22, 902 A.2d 636 (2006) (claimed instructional error regarding consciousness of guilt not constitutional in nature); *State* v. *Zamora*, 62 Conn. App. 801, 805, 772 A.2d 701 (2001) (claimed instructional error

regarding out-of-court statements not constitutional in nature).

The defendant's claim that the instructions allowed the jury improperly to consider the closing arguments as evidence is nothing more than a claim that the jury was instructed improperly on evidentiary standards. As the defendant's claim is an evidentiary, not a constitutional, claim, it does not satisfy the second condition of *Golding*, and we, thus, decline to afford it review.[13]

The judgments are affirmed.

In this opinion the other judges concurred.

---

[13] In addition, our Supreme Court "previously has recognized that unpreserved challenges to jury instructions that *mandate* inferences adverse to a defendant may sufficiently implicate constitutional rights to satisfy the second condition of *Golding*. . . . By contrast, instructions addressing *permissive* inferences are not of constitutional magnitude." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 448, 862 A.2d 817 (2005).

In this case, the court's jury instructions were permissive in nature because the jury was instructed that it was "not bound to accept the arguments of counsel . . . ." The permissive nature of these instructions prevents the defendant's claim from becoming constitutional in magnitude.