STATE OF CONNECTICUT *v.* EMANUEL
LOVELL WEBB
(AC 31710)

Gruendel, Harper and Flynn, Js.

December 9, 2010—officially released May 24, 2011

*Neal Cone*, senior assistant public defender, with whom, on the brief, was *Kent Drager*, former senior assistant public defender, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Jonathan C. Benedict*, former state's attorney, *Joseph T. Corradino*, senior assistant state's attorney, and *Marc R. Durso*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Emanuel Lovell Webb, appeals from the judgments of conviction, rendered following his conditional pleas of nolo contendere, of three counts of murder in violation of General Statutes § 53a-54a (a). The defendant claims that the court improperly granted in part the state's motion to consolidate and that the court improperly ruled that certain uncharged misconduct evidence was admissible at trial. We affirm the judgments of the trial court.

The record reflects the following relevant procedural history. In 2007, the state brought charges against the defendant under two docket numbers. In CR-07-222067, the state charged the defendant with the murder of Elizabeth G. In CR-07-222068, the state charged the defendant with the murders of Sharon C., Minnie S. and

Sheila E.[1] In June, 2007, the state filed a motion to consolidate the four murder charges for trial. The defendant objected to the motion and moved that the charges be severed. In August, 2007, the court denied the state's motion without prejudice.

In May, 2008, the state renewed its motion to consolidate. Also, by way of a motion in limine, the state asked the court to rule that certain evidence related to the defendant's conviction of involuntary manslaughter in Georgia in connection with the death of another victim, Evelyn C., was admissible uncharged misconduct evidence. The defendant opposed these motions. The court held a hearing related to the motions, during which the state and the defendant presented evidence concerning the charges and evidence at issue. On May 6, 2008, the court issued a memorandum of decision in which it consolidated the murder charges related to the deaths of Sharon C., Minnie S. and Elizabeth G. The court denied the motion to consolidate as to the charge related to the death of Sheila E. Additionally, the court ruled that evidence related to the death of Evelyn C. was admissible in each case as to the issue of identity.

Following the court's rulings, the defendant and the state entered into a plea agreement under which the defendant entered written pleas of nolo contendere as to the murder charges related to the deaths of Sharon C., Minnie S. and Elizabeth G. The state agreed to enter a nolle prosequi at the time of sentencing as to the murder charge related to the death of Sheila E. In accordance with Practice Book (2008) § 61-6 (a) (2) (ii), the defendant conditioned his pleas on his right to appeal from the court's May 6, 2008 rulings. On May 22, 2008, the court accepted the defendant's pleas and made a

[1] Because there was an obvious sexual component in the death of each victim and mindful of our policy of protecting the privacy interests of victims of sexual abuse, we do not utilize the last names of the victims. See General Statutes § 54-86e.

finding of guilt as to each of the three murder charges. At a sentencing hearing held on June 23, 2008, the court imposed a sixty year term of incarceration, to be served concurrently, for each of the charges. This appeal followed.

In its memorandum of decision, the trial court summarized the facts proffered at the hearing on the motion to consolidate. The defendant does not dispute the accuracy of these facts but challenges the court's application of the law to these facts.[2] First, the court referred to facts that were summarized in a memorandum of law submitted by the state: "During the years 1990 to 1993 a number of homicides of women occurred in Bridgeport's [e]ast [e]nd. Over the past several years these cases were assigned to the Bridgeport [p]olice [d]epartment's cold case unit. Recent investigation has developed DNA matches among four of these homicides as a result of comparison to a DNA database sample obtained following the defendant's conviction for a fifth homicide of a woman that occurred in Vidalia, Georgia on July 10, 1994. The defendant is charged with the murders of Sharon [C.] on or about April 1, 1990; Minnie [S.] on or about March 28, 1992, Elizabeth [G.] on or about April 16, 1993, and Sheila [E.] on or about June 28, 1993.

"On Sunday, April 1, 1990, at 12:48 [p.m.] the Bridgeport [f]ire [d]epartment was dispatched to Crescent and Bunnell [Streets] on a report of a car fire. This location

---

[2] We note, however, that the defendant disputes the state's assertion that the defendant's DNA was found at the relevant crime scenes. The defendant asserts that, unlike fingerprint analysis, no forensic DNA testing can yield such identifying results independent of certain inferences that must be drawn by a finder of fact in its analysis of DNA evidence. Nonetheless, based upon the information in the present case, the defendant "does not dispute the state's implied assertion in its proffer that the DNA matches in this case would allow the jury to conclude that the matched DNA found in each case is the defendant's." In analyzing the issue before us, we acknowledge the defendant's argument in this regard.

is situated approximately three blocks from the defendant's residence at 537 Carroll Avenue. After the fire was extinguished, firefighters discovered the body of Sharon [C.], age [thirty-nine], in the front passenger seat of the vehicle, nude from the waist down and disfigured by extensive burns, particularly about the face. The victim had a ligature wrapped around her neck. Vaginal smears taken at an autopsy revealed multiple intact spermatozoa, which contained the defendant's DNA. The cause of death was determined to be asphyxia due to strangulation.

"On Saturday, March 28, 1992, at 1:42 [p.m.] the Bridgeport [p]olice [d]epartment was sent to the home of Minnie [S.], age [twenty-nine], at 16 Webster Avenue in the city's [e]ast [e]nd, on report of a homicide. [The home of Minnie S.] was about eight blocks from the defendant's residence. The victim's partially clothed body was lying on her right side in her living room. [Minnie S.] had sustained stab wounds to the neck, left chest, forehead, and stomach areas. [Minnie S.'] three year old son was found unharmed inside the home. Detectives collected evidence from the crime scene including two partially smoked cigarette butts from near [the] body, one of which contained the defendant's DNA. An autopsy determined that the cause of death was multiple stab wounds and strangulation.

"On Monday, April 19, 1993, the body of Elizabeth [G.], age [thirty-three], was discovered in an abandoned building at the corner of Stratford and Fifth [Streets], approximately six blocks from the defendant's residence. [Elizabeth G.'s] pants were partially unfastened in front and her bra was pulled up so as to expose her breasts. Blood spatter evidence was noted on one of the walls and extended to a height of approximately six feet from the floor. It was believed the suspect might have been injured in the attack. Suspected blood was recovered and retained as potential evidence. Autopsy

results concluded that [Elizabeth G.] was killed by blunt force trauma to the head and strangulation. Blood from the crime scene and fingernail scrapings from the victim's body contained the defendant's DNA.

"On Monday, June 28, 1993, at 6:41 [a.m.] the body of Sheila [E.], age [twenty-nine], was found in her home at 695 Bishop [Avenue], ten blocks from the defendant's residence. [Sheila E.] had been missing for a few days. [Her] father and a friend entered [her] apartment through a window where they found her dead inside her bedroom. An autopsy concluded that the scene and the circumstances surrounding the death of the lady are suspicious. There is [an] anatomic suggestion (left eye petechial hemorrhage and neck muscle discoloration) of an asphyxia/strangulation cause of death. Both the final cause of death and manner of death were undetermined due to decomposition. A beer can recovered from the scene contained the defendant's DNA.

"The defendant resided in Bridgeport from at least 1990 through August, 1993, when he relocated to Georgia. During this time he was employed as a construction worker.

"On Sunday, July 10, 1994, the body of Evelyn [C.], age [thirty-seven], was found in her home in Vidalia, Georgia. Investigation concluded that [Evelyn C.] suffered injuries consistent with strangulation and a knife wound to the neck. The defendant was apprehended [in connection with Evelyn C.'s death] and offered a confession, in which he claimed that [Evelyn C.] died during wild sex and that he staged the scene to resemble a robbery when he realized she had died. He plead[ed] to [a charge of] involuntary manslaughter. As a consequence of his conviction, his DNA was taken an[d] entered into the CODIS [database].[3] When the cold case

---

[3] "Beginning in 1994, Congress instructed the [Federal Bureau of Investigation] to establish and maintain an index of DNA samples from convicted criminals, crime scenes, and unidentified human remains. . . . In December 2000, Congress enacted the first federal statute affirmatively directing con-

unit renewed the investigation of the murders of women in the [e]ast [e]nd which occurred during the [1990s], the items of physical evidence recovered from each crime scene were submitted to the [s]tate [p]olice [f]orensic [s]cience [l]aboratory for DNA analysis. Evidence from four of the cases, viz.: the murders of [Sharon C., Minnie S., Elizabeth G. and Sheila E.], contained DNA matching the defendant's sample in the CODIS [database]." (Internal quotation marks omitted.)

The court went on to discuss other evidence presented at the hearing: "In addition to the above, the state also presented testimony from Gregg McCrary, a consultant in the field of behavioral criminality. McCrary was previously employed as a special agent with the Federal Bureau of Investigation (FBI), having worked for ten years in the FBI's behavioral science unit. He has also written and taught in the field.

"McCrary described a process of crime scene analysis whereby factors such as physical location, victimology, method and manner of the crime, medical examiner reports and laboratory reports are reviewed. The goal of this process is to determine whether multiple crimes are linked by signature or are not linked and [are] distinguishable. He examined the homicides that are the subject of the present motion using this crime scene

victed felons to submit DNA samples to the national database. Under the DNA Analysis Backlog Elimination Act of 2000 . . . individuals convicted of a qualifying Federal offense must provide a tissue, fluid, or other bodily sample for analysis. . . . After a sample is collected, unique identifying information is obtained for each felon by decoding sequences of junk DNA, which were purposely selected because they are not associated with any known physical or medical characteristics. . . . The DNA profiles are then loaded into CODIS, a national database that also contains profiles generated by state DNA collection programs, as well as DNA samples obtained from the scenes of unsolved crimes. . . . A convicted felon's failure to cooperate constitutes a class A misdemeanor and may be punished by up to one year in prison and a fine of as much as $100,000." (Citations omitted; internal quotation marks omitted.) *United States* v. *Amerson*, 483 F.3d 73, 76 (2d Cir.), cert. denied, 552 U.S. 1042, 128 S. Ct. 646, 169 L. Ed. 2d 515 (2007).

analysis method. His findings and opinion may be summarized as follows:

"Between 1990 and 1994, there were 287 homicides in Bridgeport. . . . Sheila [E.] was not included in that number because the medical examiner could not make a determination that her death was a homicide. Out of the 287 total homicides, seven were by strangulation. Of the seven strangulations, three involved male victims and four involved female victims. Of the four strangulations involving females, the police made an arrest in one case, and the other three [cases] were initially unsolved. Those three cases were for Sharon [C.], Minnie [S.] and Elizabeth [G]. Strangulation is statistically unusual, having been present in less than 3 percent of the homicides. There were indications of strangulation in the Sheila [E.] case.

"The term backcloth refers to the context of the case with respect to the victim. The [Sharon C., Minnie S., Elizabeth G. and Sheila E.] cases presented similar backcloth factors. All four women lived in the same area on the east side of Bridgeport. All were nonprostitutes. All were drug users. All were part of the same circle in that they knew each other and were from the same socioeconomic group.

"There was a sexual component in all four cases. In [the case of Sharon C.], a vaginal smear revealed the presence of sperm. In [the case of Minnie S.], her body was found clad in a housecoat with her lower torso exposed [without] underwear. In [the case of Elizabeth G.], her shirt was pulled up, bra pushed up and her pants unzipped. In [the case of Sheila E.], a used condom was found on the floor.

"In addition to [the evidence of] strangulation, [the cases of Sharon C., Minnie S. and Elizabeth G. were characterized by] secondary injuries that disfigured

each victim in some way. Although the type of secondary injury differed, such injuries were unnecessary to the homicide. It is this aspect that McCrary examined in the linkage analysis. As to [Sheila E.], the body was too decomposed to determine the presence of secondary injuries.

"All four cases were linked forensically. The defendant's DNA was found at each scene.

"McCrary's professional opinion was that the four cases were linked because the combination of similarities provided a unique signature such that it is likely that the same person [committed] each crime. Moreover, in McCrary's opinion, the Georgia case involving Evelyn [C.] was also linked to the four Bridgeport cases. This is based on the following similarities: (1) victim was a nonprostitute, (2) strangulation, (3) sexual component, (4) secondary injuries and (5) the defendant's confession.

"The defendant offered testimony from . . . Edward McDonough, associate medical examiner. . . . McDonough reviewed the records for the four victims. He stated that in the [Sheila E.] case, the cause of death was undetermined and that while all four cases were generally related because of evidence of strangulation, the other injuries differed. In [the case of Sheila E.], there was no lethal trauma; in [the case of Minnie S.], there was strangulation plus stabbing; in [the case of Elizabeth G.], there was strangulation plus blunt trauma; and in [the case of Sharon C.], there was both manual and ligature strangulation plus postmortem burning. The defense also pointed out differences in each crime scene and the fact that unknown DNA was present at all of the scenes." (Internal quotation marks omitted.)

After discussing the evidence presented with regard to each charge, the court reasoned that the evidence

related to the deaths of Sharon C., Minnie S. and Elizabeth G. was cross admissible as uncharged misconduct evidence in each case for purposes of establishing the defendant's identity as the perpetrator of the crimes and that the evidence concerning the death of Evelyn C. was admissible for the same purpose. The court stated: "Three of the cases bear a combination of distinctive factors that amount to a signature. In the [Sharon C., Minnie S. and Elizabeth G.] cases, all of the victims (1) were killed by strangulation (a statistically rare cause of death), (2) had secondary injuries unnecessary to the homicide, (3) lived in the same area, (4) were drug users, (5) were not prostitutes and (6) were from the same social circle. In addition, in each case there was evidence suggesting a sexual aspect to the homicide, and the defendant's DNA was found at each crime scene. Moreover, all three women were likely killed on a weekend, and their bodies were discovered within ten blocks of the defendant's residence. While the defense has point[ed] to differences in each case, this is to be expected, given the dynamic nature of crimes. The key point is the similarity of the three cases which, in the court's view, is striking."[4] Also, the court concluded that "[t]he Georgia case involving Evelyn [C.] has the same criminal logo in that she (1) was strangled, (2) had secondary unnecessary injuries, (3) was killed in a sex related incident and (4) the defendant was present when she was killed." Thereafter, the court concluded that the "highly probative nature of the evidence does outweigh the potential prejudice."

---

[4] With regard to the evidence concerning the death of Sheila E., the court concluded that there was no such "signature status" evidence. The court stated: "The decomposed condition of her body prevented the medical examiner from making any finding as to strangulation, secondary injuries or even that her death was a homicide. While there are similarities between [Sheila E.] and the other victims, and the defendant's DNA was found at the scene [of her death], these factors are insufficient to constitute the criminal logo required [for admission under the uncharged misconduct exception]."

The defendant claims that the court improperly consolidated the three murder charges on the ground that the evidence concerning each charge was cross admissible for the purpose of demonstrating the perpetrator's identity. Also, the defendant claims that the court improperly ruled that the evidence in the case of Evelyn C. was admissible to prove the perpetrator's identity. We address each claim in turn.[5]

I

THE COURT'S RULING ON THE MOTION TO CONSOLIDATE

The principles guiding our review have been the subject of prior judicial decisions. As a preliminary matter, we observe that the decisions of our Supreme Court and this court "[have] recognized a clear presumption in favor of joinder and against severance . . . ." (Internal quotation marks omitted.) *State* v. *Gupta*, 297 Conn. 211, 223, 998 A.2d 1085 (2010); *State* v. *McKenzie-Adams*, 281 Conn. 486, 521, 915 A.2d 822, cert. denied, 522 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007); *State* v. *King*, 35 Conn. App. 781, 790, 647 A.2d 25 (1994) ("[j]oinder of cases is the norm"), aff'd, 235 Conn. 402, 665 A.2d 897 (1995).

"It is indisputable that the decision to join or sever offenses is submitted to the discretion of the trial court and may not be disturbed absent a manifest abuse of that discretion. . . .

---

[5] In light of our determination that consolidation was proper because the evidence in each of the three cases at issue was cross admissible with regard to the issue of identity and that the evidence concerning the death of Evelyn C. was admissible with regard to the issue of identity, there is no need for us to address the defendant's contention that neither the court's decision to consolidate the charges nor its ruling concerning evidence of Evelyn C.'s death could have been based upon cross admissibility under the standard for the admissibility of evidence of sexual misconduct set forth in *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008) (en banc), and *State* v. *Snelgrove*, 288 Conn. 742, 954 A.2d 165 (2008).

"Our General Statutes provide the basis for the trial court to join or sever criminal charges: Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise. General Statutes § 54-57; see also Practice Book § 41-19. In order for a defendant to prevail on a challenge to the court's joinder of multiple charges, the defendant must demonstrate that the denial of severance resulted in substantial injustice, and also that any resulting prejudice was beyond the curative power of the court's instructions. . . . Our Supreme Court has determined that [w]here evidence of one incident *can* be admitted at the trial of the other, separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . .

"As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. . . . The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. . . . Such evidence is admissible for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity. . . .

"The analysis on the issue of other crimes evidence is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect

of the other crimes evidence. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . .

"Our law on the use of evidence of other crimes to prove the defendant's identity is well settled. Case law has established that, on the issue of identity, the probative value of evidence of other crimes or misconduct of an accused outweighs its prejudicial impact where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . Much more is required than the mere repeated commission of crimes of the same class. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Carty*, 100 Conn. App. 40, 45–47, 916 A.2d 852, cert. denied, 282 Conn. 917, 925 A.2d 1100 (2007); see also Conn. Code Evid. § 4-5.

"[T]he fact that some of the similarities between the offenses [are] legal or relatively common occurrences when standing alone does not . . . negate the uniqueness of the offenses when viewed as a whole. It is the distinctive combination of actions which forms the signature or modus operandi of the crime . . . and it is this criminal logo which justifies the inference that the individual who committed the first offense also committed the second. . . . The process of construing an inference of [i]dentity . . . consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance

reduces the chances of there being more than one object so associated." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 164, 665 A.2d 63 (1995); see also *State* v. *King*, supra, 35 Conn. App. 791.

Having carefully reviewed the evidence presented at the hearing on the motion to consolidate, we agree with the reasoning of the trial court. The shared characteristics of the murders of Sharon C., Minnie S. and Elizabeth G. were so distinctive that they would give rise to a reasonable inference that the person who committed one murder also committed the other two murders. On the basis of the evidence presented at the hearing on the motion to consolidate, a reasonable finder of fact could conclude that there were significant similarities in terms of the characteristics of the victims. Each victim was female. The victims were within the same age range, between twenty-nine and thirty-nine years of age. The victims were from the same social circle and all had a history of illegal drug use. None of the victims were prostitutes.

Furthermore, on the basis of the evidence presented, a reasonable finder of fact could conclude that there were significant similarities in terms of the locations at which the crimes were committed, the timing of the crimes and the manner in which the crimes were committed. The crimes took place in the east end of Bridgeport within a matter of approximately three years. The crimes were likely to have been committed on weekends. The bodies of each of the female victims were discovered within approximately eight blocks of the defendant's Bridgeport residence.

The cause of death in each case was strangulation, a statistically rare manner of death in Bridgeport. As set forth in detail in the court's discussion of the facts,

the perpetrator caused secondary injuries to each victim, injuries that were not necessary to cause the victim's death. Also, each case was characterized by an obvious sexual component. Specifically, in the cases of Minnie S. and Elizabeth G., the clothing on the bodies of the victims suggested activity of a sexual nature; in the case of Sharon C., a vaginal smear revealed the presence of sperm. Another important factor shared by each crime is that a reasonable juror could find that the DNA of the defendant was found at each crime scene.

Thus, there are significant similarities concerning the victims. The facts concerning the manner of death, however, reveals a unique manner of committing the crime, one that gives rise to a strong inference that the same perpetrator caused death in each case. Each of the characteristics of the crimes, when viewed in isolation, is not necessarily distinctive. When viewed as a whole, however, the characteristics reveal a distinctive combination of factors, one that strongly suggests a modus operandi inherent in the activities of but one perpetrator. For these reasons, we conclude that the evidence related to all three charges was cross admissible for the purpose of establishing the identity of the perpetrator. In light of the strong inference to be drawn from this misconduct evidence, the defendant has not persuaded us that he was unduly prejudiced by the consolidation of the three charges for trial.

## II

## THE COURT'S EVIDENTIARY RULING

Next, we address that part of the appeal related to the court's decision to admit evidence related to the death of Evelyn C., in Georgia. The defendant claims that the court improperly ruled that the evidence related to this case was admissible uncharged misconduct evidence relevant to proving the identity of the perpetrator of the three murder charges.

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 666–67, 969 A.2d 750 (2009). In our discussion in part I of this opinion, we already have set forth the legal principles governing the admission of uncharged misconduct evidence for the issue of identity under § 4-5 of the Connecticut Code of Evidence. With regard to the identity exception, "evidence of other misconduct is admissible *only* for the purpose of raising an inference that the person who performed one misdeed also did the other. . . . Thus, misconduct evidence is admissible *only* to show that the defendant, rather than another person, committed the charged crime." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Boyd*, 295 Conn. 707, 741–42, 992 A.2d 1071 (2010). Our analysis examines, first, whether the evidence was material to the identity exception and, if so, second, whether its admission was unduly prejudicial to the defendant. See *State* v. *Figueroa*, supra, 235 Conn. 162; *State* v. *Carty*, supra, 100 Conn. App. 46.

Following our careful review of the record, we conclude that the evidence related to the death of Evelyn C. was admissible uncharged misconduct evidence in the consolidated trial concerning the deaths of Sharon C., Minnie S. and Elizabeth G. The facts concerning these three victims already have been discussed in part I of this opinion. Distinctive characteristics related to these victims, as well as the manner of their death, are common to the case of Evelyn C., for which the

defendant pleaded guilty to involuntary manslaughter before a Georgia court. Like the present victims, Evelyn C., age thirty-seven, was a female who fell within the age range of twenty-nine to thirty-nine years. Like the present victims, she died by strangulation. Like the present victims, Evelyn C. exhibited injuries that were secondary to those that caused her death, to wit: a knife wound to her neck. Like the present victims, Evelyn C.'s death featured a sexual component in that the defendant claimed that she had died during a sexual encounter with him. The defendant admitted that he staged the scene of Evelyn C.'s death to make it look like she had been the victim of a robbery. The case of Evelyn C. reveals the same distinctive type of conduct unique to the present murder victims. Accordingly, we readily conclude that the evidence gave rise to an inference that the perpetrator in the death of Evelyn C. was the perpetrator who caused the death of Sharon C., Minnie S. and Elizabeth G. Further, in light of the highly probative value of this uncharged misconduct evidence with regard to the issue of identity, we conclude that the defendant has not demonstrated that the admission of the evidence was unduly prejudicial.

The judgments are affirmed.

In this opinion the other judges concurred.